**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JOMIKA McCAULEY,

   *Plaintiff*,

*v.*

COMMISSIONER OF
SOCIAL SECURITY,

   *Defendant*.

_____/

CASE NO. 3:20-CV-13069
DISTRICT JUDGE ROBERT H. CLELAND
MAGISTRATE JUDGE PATRICIA T. MORRIS

<u>**REPORT AND RECOMMENDATION**</u>
<u>**ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND**</u>
<u>**DEFENDANT'S MOTION FOR REMAND**</u>
(ECF Nos. 22, 23)

## I.  <u>RECOMMENDATION</u>

For the following reasons, I suggest that substantial evidence does not support the Commissioner's determination that Plaintiff is not disabled. Accordingly, **I RECOMMEND** that Plaintiff's Motion for Summary Judgment, (ECF No. 22), be **GRANTED**, the Commissioner's Motion for Remand, (ECF No. 23), be **GRANTED**, and this case be **REMANDED** under sentence four of 42 U.S.C. § 405(g).

## II. <u>REPORT</u>

### A. Introduction and Procedural History

This is an action for judicial review of a final decision by the Commissioner of Social Security terminating Plaintiff's disability benefits. (ECF No. 1.)  Plaintiff originally

1

filed a protective application for period of disability and disability insurance benefits ("DIB") on April 5, 2010 and was awarded benefits on May 17, 2012, following a hearing before an administrative law judge ("ALJ"). (ECF No. 17, PageID.203–04.)

After the Commissioner determined that Plaintiff's disability had ended on August 17, 2017, (*id.* at PageID.84, 232), Plaintiff requested reconsideration by a State agency Disability Hearing Officer who upheld Plaintiff's cessation of benefits. (*Id.* at PageID.84, 278–82.) Plaintiff subsequently requested a hearing before an ALJ which was held on September 4, 2019. (*Id.* at PageID.148, 258–62.) Plaintiff was not represented by counsel at this hearing. (*Id.* at PageID.150.) The ALJ found that Plaintiff was not disabled, and the Appeals Council upheld his decision. (*Id.* at PageID.81, 75.) Plaintiff requested judicial review on November 17, 2020. (ECF No.1.) Plaintiff moved for summary judgment, the Commissioner moved for this Court to remand this matter to the Social Security Administration, Plaintiff responded, and briefing is complete. (ECF Nos. 22, 23, 24.)

## B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted to determining solely whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

### C. Framework for Disability Determinations

When, as here, a recipient of disability benefits challenges the cessation of benefits, the central issue is whether the recipient's medical impairments have improved to the point where she is able to perform substantial gainful activity. 42 U.S.C. § 423(f)(1); *Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007). Whether an individual is entitled to continued benefits depends on whether "there has been any medical improvement in [the person's] impairment(s) and, if so, whether this medical improvement is related to [the person's] ability to work." 20 C.F.R. §§ 404.1594(a), 416.994(b).

The implementing regulations incorporate many of the standards set forth in regulations governing initial disability determinations. *See* 20 C.F.R. §§ 404.1594(b)(5), 404.1594(f)(7). The difference, however, is that the ultimate burden of proof lies with the

Commissioner in termination proceedings. *Id.*; *Kennedy*, 247 F. App'x at 764; *Griego v. Sullivan*, 940 F.2d 942, 944 (5th Cir. 1991).

The cessation evaluation process is a two-part process. *See Kennedy*, 247 F. App'x 764–65. The first part of the process focuses on medical improvement. *Id.* at 764. The implementing regulations define "medical improvement" as "any decrease in the medical severity of [the individual's] impairment(s) which was present at the time of the most recent favorable medical decision that [the individual was] disabled or continued to be disabled." *Id.* at 764–65 (citing 20 C.F.R. § 404.1594(b)(1)). "A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the person's] impairment(s)." 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1). If there has been a decrease in the severity of the impairments since the favorable decision, the medical improvement is related to the individual's ability to work only if there has been a corresponding 'increase in [the claimant's] functional capacity to do basic work activities . . . .'" *Kennedy*, 247 F. App'x at 765 (quoting 20 C.F.R. § 404.1594(b)(3)).

The second part of the cessation analysis focuses on whether the person can engage in substantial gainful activity. *Kennedy*, 247 F. App'x at 765. The implementing regulations for this part of the evaluation incorporate many of the standards set forth in the regulations that govern initial disability determinations. *Id.* (citing 20 C.F.R. § 404.1594(b)(5) and (f)(7)). The difference is that "the ultimate burden of proof lies with the Commissioner in termination proceedings." *Id.* (citing 20 C.F.R. § 404.1594(b)(5) and (f)(7); *Griego*, 940 F.2d at 944).

4

An increase in the claimant's functional capacity will lead to a cessation of benefits only if, as a result, the claimant can perform her past work or other work that exists in significant numbers in the national economy.  20 C.F.R. §§404.1594(f)(7)–(8), 416.994(b)(5)(vii), (viii).

In deciding whether a recipient's entitlement to disability benefits has ended, the Commissioner uses the eight-step sequential evaluation process outlined in 20 C.F.R. §§ 404.1594(f)(1)-(8) and 416.994(b)(5)(i)-(viii). *Kennedy*, 247 F. App'x at 764.  The steps are:

(1) Are you engaging in substantial gainful activity?  If you are . . . we will find disability to have ended . . . .

(2) If you are not, do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of this subpart?  If you do, your disability will be found to continue.

(3) If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section? . . .

(4) If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1) through (4) of this section . . . .

(5) If we found at step (3) that there has been no medical improvement or if we found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply. . . .

(6) If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe . . . .

(7) If your impairment(s) is severe, . . . . we will assess your residual functional capacity based on all your current impairments and consider whether you can

still do work you have done in the past.  If you can do such work, disability will be found to have ended.

(8) If you are not able to do work you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment . . . .  If you can, we will find that your disability has ended.  If you cannot, we will find that your disability continues.

20 C.F.R. §§ 404.1594(f), 416.994(b)(5).

There is no presumption of continuing disability.  *Kennedy*, 247 F. App'x at 764 (citing *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286–87 n. 1 (6th Cir. 1994)).  Instead, the Commissioner applies the above procedures to determine whether the claimant's disability has ended and if she is now able to work.  *Id.*

### D. ALJ Findings

Following the eight-step sequential analysis, the ALJ found that Plaintiff's disability ended on August 17, 2017, and that she had not become disabled again since then. (ECF No. 17, PageID.84.)  First, the ALJ found that Plaintiff had not been engaging in substantial gainful activity.  (*Id.* at PageID.86.)  The ALJ then found that Plaintiff had the following severe, medically determinable impairments since August 17, 2017: degenerative disc disease of the lumbar and cervical spine, osteoarthritis, diabetes type II with neuropathy, obesity, and depressive disorder.  (*Id.*)  The ALJ found that none of Plaintiff's impairments met or medically equaled any listings.  (*Id.* at 86–88.)  The ALJ determined that medical improvement occurred on August 17, 2017 and that Plaintiff's medical improvement was related to her ability to work.  (*Id.* at PageID.88.)

Based on Plaintiff's severe impairments as of August 17, 2017, the ALJ found that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) (2021), except that she:

> can occasionally bend, stoop, crawl, and other postural maneuvers [sic]; she requires rotating between sitting and standing every 30 to 60 minutes; she is limited to simple, routine, and repetitive tasks, performed in a work environment free of fast paced production requirements; and she is limited to simple work related decisions with few if any workplace changes.

(*Id.*)  Based on Plaintiff's RFC, the ALJ found that she was unable to perform her past relevant work.  (*Id.* at PageID.92.)  The ALJ then found that Plaintiff could perform a significant number of jobs in the national economy.  (*Id.* at PageID.93.)  Accordingly, the ALJ determined that Plaintiff's disability ended on August 17, 2017.  (*Id.* at PageID.94.)

### E.  Administrative Record

#### 1.  Medical Evidence

Plaintiff is a type II diabetic who also suffers from arthritis and chronic ovarian cysts.  (ECF No. 17, PageID.91, 160, 217, 968, 1248, 1251.)  Her physical impairments cause her immense pain that she manages by taking Norco, an opioid painkiller, several times per day.  (*Id.* at PageID.157–58, 927); *Norco – Uses, Side Effects, and More*, WebMD (last visited Nov. 11, 2021), https://www.webmd.com/drugs/2/drug-63/norco-oral/details. Plaintiff also suffers from depression, anxiety, and psychotic symptoms.  (ECF No. 17, PageID.216, 868–69, 881, 895.)

From at least September 2017 through 2019, Plaintiff was treated at the Oakland Psychological Clinic.  (*Id.* at PageId.90, 659, 931.)  Plaintiff informed the clinic that she began to experience "very bad anxiety, panic attacks, [and] depression" after her daughter

7

died from cerebral palsy in 2013. (*Id.* at PageID.915.) Her daughter's death also triggered paranoia and hallucinations. (*Id.* at PageID.868–69, 895, 915, 949, 951, 954, 958, 960.) Indeed, Plaintiff reported that she frequently heard voices that told her to "hurt" herself. (*Id.* at PageID.915.) The Clinic diagnosed Plaintiff with major depressive disorder with recurrent psychotic episodes, insomnia, and cannabis withdrawal. (*Id.* at PageID.923.)

Throughout her treatment at the Oakland Psychological Clinic, Plaintiff consistently reported psychotic symptoms. (*Id.* at PageID.868–69, 895, 915, 949, 951, 954, 958, 960.) Plaintiff's psychiatrist regularly noted that Plaintiff had difficulty concentrating and frequently displayed a "flat" affect. (*Id.* at PageID.870, 877, 882, 899, 908, 936.) Plaintiff was prescribed therapy, Buspar, and Xanax. (*Id.* PageID.1280.) However, Plaintiff reported to the clinic that her medication made her feel "spacey." (*Id.* at PageID.867.)

Although Plaintiff's treating psychiatrist, Doctor Nikhil Vora, did not opine on Plaintiff's functional limitations, Plaintiff's psychological impairments were examined by two state examiners. (*Id.* at PageID.217, 678.) In December 2017, Plaintiff's psychological symptoms were evaluated by an examining consultative psychologist, Doctor George Starrett. (*Id.* at PageID.678.) Doctor Starrett noted that Plaintiff was diagnosed with depression and anxiety, but that her symptoms seemed "to be very well controlled with medication." (*Id.* at PageID.692.) Notwithstanding one emergency room visit for a panic attack, Plaintiff had no "emergent intervention." (*Id.*) Plaintiff socialized, performed "personal care," took care of her child, and handled finances. (*Id.*) Accordingly, Doctor Starrett opined that while Plaintiff's depression and anxiety were medically determinable impairments, they were nonsevere and cause no more than "mild" functional

8

limitations.  (*Id.* at PageID.681, 683, 690, 692.)  However, Doctor Starrett's opinion, issued in 2017, predated most of Plaintiff's treatment at the Oakland Psychological Clinic, which continued through 2019, and Doctor Starrett's opinion did not mention Plaintiff's psychotic symptoms.  (*See id.* at PageID.678, 692.)

Doctor Starrett's opinion was largely consistent with the nonexamining consultative psychologist, Doctor Joe DeLoach.  In August 2017, Doctor DeLoach found that Plaintiff's depression and anxiety were nonsevere.  (*Id.* at PageID.216–17.)  Based on Plaintiff's third party Activities of Daily Living Report, Doctor DeLoach found that Plaintiff had "no problems with memory, completing tasks, concentration, understanding, following instructions[,] or getting along with others."  (*Id.* at PageID.217.)  Like Doctor Starrett, Doctor DeLoach's opinion predated much of Plaintiff's psychological records from the Oakland Psychological Clinic and did not discuss Plaintiff's psychotic symptoms.  (*See id.*)

Plaintiff's physical impairments were examined on October 2019 by a state consultative examiner, Doctor Asit Ray.  (*Id.* at PageID.1248.)  Doctor Ray opined that Plaintiff could be gainfully employed "without any physical restrictions as far as her musculoskeletal system [was] concerned."  (*Id.* at PageID.1251.)  Although Plaintiff complained of arthritis and pain in her back and lower extremities, Doctor Ray reported that Plaintiff exhibited a mostly normal range of motion and "intact" muscle strength in Plaintiff's arms and legs.  (*Id.*)  A neurological examination found a "loss of ankle reflex" on Plaintiff's right side and Plaintiff "voiced diminished sensation in" her right arm.  (*Id.*)  Still, Doctor Ray found "no abnormal clinical finding[s]" in Plaintiff's knees and he

9

mentioned that Plaintiff was "independent in her self-care and activities of daily living." (*Id.*)

### 2. The September 2019 Administrative Hearing

The most recent administrative hearing in Plaintiff's case was held on September 4, 2019. (*Id.* at PageID.150.) Plaintiff appeared at the hearing without representation. (*Id.*)

Plaintiff testified that she suffered from chronic pain due to arthritis in her knees and neuropathy from her diabetes. (*Id.* at PageID.153, 155.) The neuropathy caused pain in her knees, feet, and the left side of her back. (*Id.* at PageID.155.) Plaintiff testified that at one point her neuropathy was so severe that she needed assistance to stand up from the toilet. (*Id.*) Plaintiff stated that she could not walk a quarter of a mile without needing to rest, and that she could only remain seated for up to an hour, and that is if she was on medication. (*Id.* at PageID.156–57.) She shared that she had no problem standing but that she would often "slouch over." (*Id.* at PageID.157.)

Plaintiff testified that she took Norco four times per day to treat her pain. (*Id.* at PageID.158.) When on her medication, Plaintiff would often have to lie down throughout the day. (*Id.*) Plaintiff also took medication for her anxiety and depression. (*Id.*)

Plaintiff claimed that her psychological impairments also prevented her from working. Specifically, Plaintiff stated that she "hear[d] voices a lot." (*Id.*) Indeed, before Plaintiff "got . . . on a good level dosage" she would hear voices "every night to the point" where she could not "sleep for days." (*Id.*)

Plaintiff cared for one child and although she had a driver's license, she could not drive because her medications made her drowsy. (*Id.* at PageID.159.) Plaintiff began using

a walker because her knees would "sometimes give out" causing her to fall.  (*Id.*)  Plaintiff also told the ALJ that she would get "golf ball" sized ovarian cysts "several times" per month.  (*Id.* at PageID.160.)

The ALJ then questioned the Vocational Expert ("VE").  (*Id.* at PageID.163.)  The ALJ asked the VE to assume a "hypothetical individual who" was "situated" identically to Plaintiff and could perform sedentary work, except that this individual could lift up to ten pounds "occasionally" and less weight more frequently.  (*Id.*)  The hypothetical person could perform postural activities such as "bending, kneeling, stooping, kneeling, crouching[, and] crawling" occasionally.  (*Id.*)  The person must be "allowed to alternate between sitting and standing . . . every one[-]half hour to one hour."  (*Id.*)  All of the individual's work must have been limited to "simple routine[,] and repetitive tasks that are performed in a work environment free of fast paced production requirements," and the individual could only make "simple work-related decisions" with "few, if any[,] workplace changes."  (*Id.*)

The ALJ assumed that Plaintiff could not perform her prior work in patient care and asked the ALJ whether any jobs were available in the national economy for someone with the same limitations as the hypothetical person.  (*Id.* at PageID.163–64.)  The VE responded that, based on his experience and the Dictionary of Occupational Titles ("DOT"), someone with those limitations could perform jobs such as a sorter, DOT code 521.687-086, sedentary work, approximately 100,000 jobs, and a bench assembler, DOT code 713.687-018, sedentary work, approximately 200,000 jobs.  (*Id.* at PageID.164.)

The ALJ then asked whether any jobs in the national economy would be available for a person with the same limitations who would also miss "three to four" days of work per month. (*Id.*)  The VE testified that no jobs would be available for such a person. (*Id.*) Similarly, when asked whether any jobs would be available for the same person if he or she would need to be "off task" for more than a fifth of each workday, the VE testified that no jobs would be available for this person. (*Id.*)

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2012).  The newly promulgated regulations, applicable to cessations of disability benefits on or after the effective date of March 27, 2017, such as the matter here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)   Licensed physician (medical or osteopathic doctor);

(2)   Licensed Psychologist, which includes:

    (i)   A licensed or certified psychologist at the independent practice level; or

    (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)   Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)   Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices

12

permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)     Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and

private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.* § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.* § 404.1520c(c)(3). This factor will include the analysis of:

      (i)      Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

      (ii)     Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

      (iii)    Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

      (iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

      (v)     Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will

also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such,

16

the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.  We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record."  *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision."  *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section."  *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c."  *Id.* § 404.1520b(c).  The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical

17

issue, vocational issue, or the ultimate issue about whether you are disabled;" and

"[s]tatements on issues reserved to the Commissioner[;]" these statements include:

> (i)     Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

> (ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

> (iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

> (iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

> (v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

> (vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f).  Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.*  Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain.  "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.* § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living),"

which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

    (i)      [D]aily activities;

    (ii)     The location, duration, frequency, and intensity of . . . pain;

    (iii)    Precipitating and aggravating factors;

    (iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

    (v)     Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*

§ 404.1530(b).  Acceptable (or "good") reasons for failure to follow prescribed treatment

include:

> (1)  The specific medical treatment is contrary to the established teaching and tenets of your religion;
>
> (2)  The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;
>
> (3)  Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;
>
> (4)  The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
>
> (5)  The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

### G. Analysis

Plaintiff and the Commissioner agree that the ALJ erred by (1) mischaracterizing the record and (2) failing to adequately develop the record by ordering additional consultative examinations.  Both parties move this Court to remand the matter to the Social Security Administration; however, they dispute whether the ALJ must conduct another hearing following remand.  For the following reasons, I suggest that this matter should be remanded to the Commissioner who must consider all objective medical evidence in the record, obtain an additional psychological medical opinion, and conduct a new hearing.

#### 1.   The ALJ's Errors

##### i.   Whether the ALJ Considered the Entire Record

The parties agree, correctly, that the ALJ significantly mischaracterized the record as to Plaintiff's psychological symptoms.

With respect to Plaintiff's psychological impairments, the ALJ ignored substantial portions of the record that contradicted his findings. ALJs are required to "consider all evidence available in [the claimant's] case record." 42 U.S.C. § 423(d)(5)(B) (2012); *see also* Carolyn A, Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Court § 6:20 (2019) ("It should be fairly obvious that the ALJ must evaluate all of the evidence, and may not disregard any of the relevant evidence.").

In *Howard v. Comm'r of Soc. Sec.*, the Sixth Circuit held that an ALJ erred by dismissing treatment notes that contained "a substantial portion" of the claimant's medical history. 276 F.3d 235, 241–42 (6th Cir. 2002). Although the notes contained several of the claimant's complaints along with his doctor's impressions, the ALJ dismissed them entirely because they were illegible, "handwritten gobblegook." *Id.* at 241. The Sixth Circuit disagreed that the notes were completely illegible and reasoned that because the ALJ completely disregarded a "significant portion" of the record, his decision was not supported by substantial evidence. *Id.* at 242.

Similarly, here, the ALJ did not consider all of the relevant evidence in Plaintiff's case record. Specifically, the ALJ found that Plaintiff "never made any complaints of . . . psychotic symptoms" to her treating physicians. (ECF No. 17, PageID.1293.) Yet, the record indicates that Plaintiff reported "hearing voices" to her psychiatrist on several occasions. (*Id.* at PageID.868–69, 895, 915, 949, 951, 954, 958, 960.) The ALJ also found that Plaintiff never made "any complaints of lack of focus, concentration, or motivation."

23

(*Id.* at PageID.90.)   However, Plaintiff frequently complained about difficulties with concentration.  (*Id.* at PageID.877, 882, 899, 908, 936, 945, 949, 954, 958.)  Although the ALJ stated that Plaintiff's "Mental Status Examinations were relatively normal," Plaintiff's "affect" was almost always "flat or labile."   (*Compare id.* at PageID.90, *with id.* at PageID.870, 877, 882, 899, 909, 917, 945, 949, 954, 958.)  Last, the ALJ also stated that Plaintiff "*never* made any complaints of any symptoms related to her medications," but Plaintiff did once report that her medications made her "spacey" and tired.  (*Compare id.* at PageID.90 (emphasis added), *with id.* at PageID.867.)   The ALJ's description of Plaintiff's psychological symptoms contradicts, without any explanation, a substantial portion of the record, indicating that the ALJ did not consider this evidence.  *Cf. Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 322–23 (6th Cir. 2015); *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) ("[F]ailure to consider the record as a whole undermines the Secretary's conclusion.").

This error harmed Plaintiff.  This evidence would have been relevant at steps two and three of the sequential evaluation process and may have led the ALJ to find that Plaintiff met the listing for psychotic disorders.  *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.03.  These symptoms may justify a more restrictive RFC, and they may indicate a "substantial loss of ability" to "respond appropriately to supervision, coworkers, and usual work situations."  SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985).  This alone may "justify a finding of disability . . . ."  *Id.*

I clarify that the ALJ's duty to consider the entire record is distinct from the ALJ's obligation to make a decision that is supported by substantial evidence.  This is not

24

necessarily a situation where the ALJ considered, but ignored, the overwhelming weight of the evidence and relied on isolated portions of the record to support his decision; rather, the ALJ's discussion suggests that the ALJ was not even aware of Plaintiff's reports of her psychological symptoms. *Cf. Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723–24 (6th Cir. 2014). To determine whether an ALJ's decision is supported by substantial evidence, this Court must look to the record as a whole, not just the portions of the record cited by the ALJ. *Walker v. Sec'y of Health and Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Thus, an ALJ's decision may be supported by substantial evidence even where the ALJ does not consider the entire record. *See id.* However, an ALJ's consideration of the entire record is a prerequisite to this Court finding substantial evidence—the ALJ's failure to consider the whole record, regardless of whether the ALJ's decision is otherwise supported by substantial evidence, is in itself a legal error. *See Howard*, 276 F.3d at 241–42; 42 U.S.C. § 423(d)(5)(B).

I decline to determine whether the ALJ's findings were supported by substantial evidence. On remand, I suggest that the ALJ must weigh this evidence and consider it at each relevant step of the sequential evaluation process. It is the ALJ, not the Court, who must weigh the evidence. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). Accordingly, I suggest that the ALJ must consider this evidence and then arrive at a decision that is supported by substantial evidence.

### ii.   Duty to Obtain Additional Consultative Examinations

"The claimant bears the ultimate burden" of proving that he or she "is entitled to disability benefits." *Nabours v. Comm'r of Soc. Sec.*, 50 F. App'x 272, 275 (6th Cir. 2002).

Accordingly, although ALJs have a basic "responsibility" to "ensur[e] that every claimant receives a full and fair hearing . . . ," this basic obligation only "rises to a heightened duty to develop the record" under "special circumstances" such as where, as in the present case, the claimant was unrepresented by counsel before the ALJ. *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051–52 (6th Cir. 1983) (citing *Richardson v. Perales*, 402 U.S. 389, 411 (1971); see 42 U.S.C. § 423(d)(5)(B) ([T]he Commissioner of Social Security shall make every reasonable effort to obtain . . . all medical evidence . . . ."). "To satisfy this special duty the administrative law judge must 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Lashley*, 708 F.2d at 1052 (quoting *Gold v. Secretary of Health, Educ. & Welfare*, 463 F.2d 38, 43 (2d Cir. 1972)). There is not a bright line test for whether the ALJ has failed to fully develop the record—this determination is "made on a case-by-case basis." *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 363 (6th Cir. 2014).

Although an ALJ ordinarily has discretion to decide whether to order additional consultative examinations, ALJs may be required to order additional consultative examinations where it "is necessary to enable the [ALJ] to make the disability decision." *Landsaw v. Secy. Of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (first citing 20 C.F.R. § 404.1517 (2021); and then quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)); *see also Kish v. Colvin*, 552 F. App'x 650, 651 (9th Cir. 2014); 20 C.F.R. § 404.1519 (2021).

Plaintiff argues that the ALJ failed to adequately develop the record because his RFC finding was unsupported by medical opinion evidence. Plaintiff asserts that the ALJ

may not render a decision that is not supported by a medical opinion. Therefore, because the ALJ found that all of the available medical opinions were not persuasive, he was required to order additional consultative examinations before rendering a decision. (*See* ECF No. 17, PageID.90–92.)

This issue necessarily turns on whether an ALJ may render a decision without supporting medical opinion evidence. If the ALJ here was required to base his decision on corroborating opinion evidence, then, having found that the available opinions were not persuasive, the ALJ must have ordered additional opinions before making a decision. If the ALJ need not have supported his decision with opinion evidence, then the question becomes whether the remaining objective medical evidence in the record is sufficiently developed to support a decision on whether Plaintiff is disabled.

Courts within the Sixth Circuit are divided on whether an ALJ may render a decision that is not supported by a medical opinion. A growing number of courts have held that an "ALJ must generally obtain expert opinion when formulating the RFC unless the medical evidence shows relatively little physical impairment such that the ALJ can permissibly render a commonsense judgment about functional capacity. *Gross v. Comm'r of Soc. Sec.*, 247 F. Supp.3d 824, 828 (E.D. Mich. 2017) (quotation marks omitted) (collecting cases).

The seminal decision in this line of cases comes from *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp.2d 908 (N.D. Ohio 2008). In *Deskin*, the Northern District of Ohio held that an ALJ's finding that a claimant was not disabled was not supported by substantial evidence because the ALJ analyzed the claimant's RFC without any supporting medical opinion evidence. *Id.* at 912–13. The claimant in *Deskin* alleged "multiple impairments

of her spine." *Id.* at 910.  Although the claimant had an "extensive" and "well documented" treatment history, none of her treating physicians provided a medical opinion on her functional abilities.  *Id.*  The record contained only one medical opinion, from the state examining physician; however, this opinion predated about two years of medical records. *Id.*  Nonetheless, the ALJ, instead of "ordering a consultative examination or having a medical expert testify at the hearing," analyzed the two years of medical evidence himself and rendered a decision.  *Id.*

The *Deskin* Court reasoned that ALJs are not qualified to "interpret raw medical data in functional terms."  *Id.* at 912 (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999)).  Because ALJs are not medical experts, where "medical findings . . . merely diagnose" the claimant's "impairments and do not relate these diagnoses to specific residual functional capabilities such as those set out in 20 C.F.R. § 404.1567(a) . . . [the Commissioner may not] make the connection himself."  *Id.*  Still, the court recognized that if "the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment."  *Id.*  However, because the two years of evidence which the ALJ analyzed himself contained "extensive MRI findings of diffuse and substantial degenerative disc disease," the ALJ required a medical opinion to "translat[e]" this evidence.  *Id.* at 913.

*Deskin* has received some negative treatment from other courts in this Circuit.  For example, in *Henderson v. Comm'r of Soc. Sec.*, another judge from the Northern District of Ohio held that *Deskin* did not apply where an ALJ had opinion evidence that accounted for the entire medical record, but nonetheless chose not to rely on any of the available

medical opinions.  No. 1:08 CV 2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010).
The court reasoned that *Deskin* was "not representative of the law established by the
legislature[] and interpreted by the Sixth Circuit Court of Appeals." *Id.*  Specifically, the
court noted that it is "[t]he ALJ, not a physician" who "is assigned the responsibility of
determining the claimant's RFC . . . ." *Id.* (citing 20 C.F.R. § 416.946(c) (2021)).  It is the
ALJ who is entrusted with reviewing the objective evidence, including medical opinions.
*Id.*  Thus, the court reasoned that *Deskin*'s holding infringed on the ALJ's responsibility to
weigh the claimant's medical evidence under the regulations.  *Id.*

    *Henderson* is supported by a handful of unreported Sixth Circuit cases which hold
that an ALJ's RFC determination may be supported by substantial evidence, even if no
"physician offers an opinion consistent with that of the ALJ."  *Mokbel-Aljahmi v. Comm'r
of Soc. Sec.*, 732 F. App'x 395,401 (6th Cir. 2018); *see also Shepard v. Comm'r of Soc.
Sec.*, 705 F. App'x 435, 442–43 (6th Cir. 2017); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x
719, 728 (6th Cir. 2013) (reasoning that requiring the "ALJ to base her RFC finding on a
physician's opinion, 'would, in effect, confer upon the treating source the authority to make
the determination or decision about whether an individual is under a disability, and thus
would be an abdication of the Commissioner's statutory responsibility to determine
whether an individual is disabled'").

    Shortly after *Henderson,* the same judge who authored *Deskin* issued another
opinion where he differentiated *Deskin* from *Henderson*.  *Kizys v. Comm'r of Soc. Sec.*,
No. 3:10 CV 25, 2011 WL 5024866 (N.D. Ohio Oct. 21, 2011).  The judge clarified that
*Deskin* did not hold that ALJs could not make an RFC finding unless it was supported by

a medical opinion; rather, *Deskin* held that an ALJ's decision is not supported by substantial evidence if the ALJ must interpret a substantial portion of the medical evidence without the assistance of a medical opinion. *Id.* at *1–2. The *Deskin* rule was narrow and applied only "when an ALJ makes a finding . . . based on no medical source opinion or an outdated source opinion that does not include consideration of a critical body of objective evidence." *Id.* at *2.

Indeed, the policy concerns underlying the *Deskin* opinion are not present in cases like *Henderson*. Where an ALJ has medical opinions that account for the entire relevant period, he or she is not analyzing "raw" data. *See id.* Even if the ALJ chooses to completely depart from the available opinions, he or she is not doing so blindly—the "raw" medical evidence has already been "interpreted" for the ALJ. *See Deskin*, 605 F. Supp.2d at 912; *Mcgranahan v. Colvin*, No. 0:14-CV-83, 2015 WL 5828098, at *3 (E.D. Ky. Oct. 1, 2015) ("[T]he ALJ is not qualified to assess the Plaintiff's RFC on the basis of bare medical evidence . . . ."). Where an ALJ has opinions that account for the entire body of evidence, an ALJ is in a suitable position to make judgments on the supportability and consistency of the medical opinions, and can adopt an RFC accordingly. *See Kizys*, 2011 WL 5024866, at *2.

I find the approach in *Deskin* and *Kizys* persuasive. Accordingly, I suggest that where a "critical body" of the "objective medical evidence" is not accounted for by a medical opinion and there is significant evidence of potentially disabling conditions, the ALJ should develop the record by obtaining opinion evidence that accounts for the entire relevant period. *See Branscum v. Berryhill*, No. 6:17-CV-345, 2019 WL 475013, at *11

(E.D. Ky. Feb. 6, 2019).  However, where an ALJ has medical opinion evidence covering the entire relevant period, the ALJ need not make an RFC finding consistent with any of the available medical opinions.  *See Kizys*, 2011 WL 5024866, at *2.

Applying this rule, I suggest that the ALJ's RFC finding with respect to Plaintiff's psychological impairments is not properly supported by opinion evidence.  The record contains two psychological opinions: one from Doctor DeLoach from August, 2017, and one from Doctor Starrett from December, 2017.  (ECF No. 17, PageID.217, 678.)  However, Plaintiff has provided psychological medical records through August 2019.  Thus, nearly two years of medical records were not considered in either medical opinion.  These two years of records contain a "critical" portion of the record as they contain numerous examples of Plaintiff's psychotic symptoms, medication side effects, and poor concentration.  (*See id.* at PageID. 867–69, 877, 882, 895, 899, 908, 915, 936, 945, 949, 951, 954, 958, 960.)  However, neither the medical opinions nor the ALJ's decisions considered this evidence, and, unsurprisingly, neither medical opinion discusses Plaintiff's psychosis.  (*See* ECF No. 17, PageID.216–17, 678, 680.)  Accordingly, I suggest that the ALJ must obtain additional opinion evidence regarding Plaintiff's psychological impairments.[1]

However, The ALJ need not obtain additional medical opinions regarding Plaintiff's physical impairments.  The Commissioner ordered a physical consultative examination that

---

[1] Although Plaintiff asserts otherwise, I suggest that this new opinion need not be a consultative examination.  The ALJ may, for example, "call a medical expert at the hearing" or "recontact the treating source" for an opinion.  *Deskin*, 605 F. Supp.2d at 912.

was conducted in October 2019.  (ECF No. 17, PageID.1248).  This exam postdates all of Plaintiff's medical evidence related to her physical symptoms.[2]  (*See* ECF No. 17, PageID.71–74.)  Accordingly, *Deskin* does not apply.  *See Kizys*, 2011 WL 5024866, at *2.

Plaintiff does not argue that the ALJ should have developed the record further by collecting additional medical records.  (ECF No. 22, PageID.1293–94.)  Accordingly, I consider this argument waived.  *See Roberts v. Comm'r of Soc. Sec.*, No. 2:14-cv-11994, 2015 WL 5439707, at *14 (E.D. Mich. June 9, 2015) (citing *Stiltner v. Comm'r of Soc. Sec.*, 244 F. App'x 685, 686 (6th Cir. 2007)).  Even so, I suggest that the ALJ adequately developed the record with respect to Plaintiff's physical impairments.  In the ALJ's decision, he referenced Plaintiff's records, through September 2019, from her treating physicians at the Chronic Pain Consultants.  (ECF No. 17, PageID.90–91.)  The ALJ obtained records of Plaintiff's prescriptions and an MRI of Plaintiff's spine.  (*Id.*)  The ALJ also held a hearing with Plaintiff for half an hour where he primarily discussed Plaintiff's physical symptoms, and he ordered a consultative examination.   (*See id.* at PageID.150–68); *cf. Forrest*, 591 F. App'x at 363.  Accordingly, I find that the ALJ "scrupulously and conscientiously" inquired into all of the relevant facts related to Plaintiff's physical impairments.[3]  *See Lashley*, 708 F.2d at 1052.

---

[2] This examination is incorrectly labelled in the record as "CE Psychiatry."  (*Id.* at PageID.74.)

[3] Although Plaintiff asserts that the ALJ's analysis was "flawed," she argues only that the ALJ did not rely on substantial evidence because the ALJ did not base his opinion on a persuasive medical opinion, not because he inadequately weighed the evidence.  (ECF No. 22, PageID.1293–94.)  Still, I suggest that the ALJ's physical RFC findings, based on the available evidence, are supported by substantial evidence.  The ALJ found a highly restrictive RFC and discussed Plaintiff's medical records in detail.  (ECF No. 17, PageID.88–92.)  Even though the ALJ's RFC was not consistent with any medical opinion, the ALJ's RFC was significantly more restrictive than any medical opinion in the record.  (*See id.*)  Although Plaintiff points to evidence that weighs against the ALJ's RFC finding, this evidence, at most, provides substantial

On remand, I suggest that the ALJ should order an additional medical opinion regarding Plaintiff's psychological impairments but that the ALJ need not order an additional medical opinion regarding Plaintiff's physical impairments.[4]

## 2.      Whether the Court should Order a Rehearing

While the Parties agree that the ALJ erred, they disagree on the proper remedy. Specifically, Plaintiff argues that this Court should order a rehearing, while the Commissioner argues that the decision as to whether to conduct a rehearing is within the sole discretion of the Social Security Administration ("SSA").

Under sentence four of 42 U.S.C. § 405(g) (2012) (emphasis added), this Court may "enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, *with or without remanding the cause for a rehearing*."

The regulations elaborate on the procedure the SSA must follow after a remand. In relevant part, 20 C.F.R. § 404.983(a) (2021) provides that, following a remand from the District Court, the Appeals Council has the discretion to make a decision, dismiss the proceedings, or remand the matter to an ALJ. If sent to an ALJ, the Hearing, Appeals, and Litigation Law Manual ("HALLEX")[5] instructs ALJs that they

---

evidence to support a more restrictive RFC. However, this Court's review is limited to whether the ALJ's finding was supported by substantial evidence. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

[4] I suggest declining to award benefits here because benefits may only be awarded "where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 865 (6th Cir. 2011) (citing *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir.1994)). That is not the case here—after considering the entire record and obtaining an additional medical opinion, the ALJ might still arrive at the same outcome. Therefore, remand is appropriate to correct these errors.

[5] The HALLEX Manual is an internal manual, promulgated by the Associate Commissioner of Hearings and Appeals to provide "'guiding principles, procedural guidance and information' to adjudicators and staff of the Office of Hearings and Appeals." *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 397 (6th Cir. 2008)

shall offer the claimant the opportunity for a hearing except in a claim for Title II disability insurance benefits when the period at issue expired before the date of the hearing decision (e.g., insured status expired in a disabled worker's claim or the claimant reached age 22 in a child's insurance benefits claim). In those instances, the Administrative Law Judge need not offer the claimant the opportunity for a hearing unless the Administrative Law Judge finds that the facts warrant it.

HALLEX, *supra*, § II-5-1-3.   The Commissioner argues that while the Court may remand the matter to the SSA for further consideration, the decision to hold a rehearing is left exclusively to the SSA's discretion.  (ECF No. 23, PageID.1304.)  Plaintiff argues that § 405(g) provides the Court with the discretion to order a rehearing, and the Court's decision must be followed by the SSA, notwithstanding the contrary provisions in the regulations and the HALLEX Manual.  (ECF No. 24, PageID.1307–08.)

The "with or without remanding the cause for a rehearing" language provides the court with "additional flexibility" to remand the case for an immediate payment of benefits. *Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1099-1100 (9th Cir. 2014). I do not find that the referenced statutory language undermines the provisions under 20 C.F.R. §§ 404.983, 416.1483. Under this regulation, I find that the Court's remand should simply be "to the Commissioner for further consideration" and that "the Appeals Council, acting on behalf of the Commissioner, may make a decision…dismiss the proceedings…or remand the case to an administrative law judge…" Thus, the court will not recommend any

---

(quoting Soc. Sec. Admin., Office of Hearings and Appeals, *Hearings, Appeals and Litigation Law Manual* I-1-0-5 (2011) [hereinafter *HALLEX*]).  Although not binding on this Court, "staff and adjudicators" are required to comply with the HALLEX Manual.  *Id.* at 399; *Diane B. v. Comm'r of Soc. Sec.*, No. 2:18-cv-1, 2018 WL 5024171, at *5 (D. Vt. Oct. 16, 2018).

language beyond remanding the case to the Commissioner under sentence four of § 405(g).

*Id.*, see also *Social Security Law and Practice*, §§53.57-59.

### H. Conclusion

For the reasons stated above, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment, (ECF No. 22), be **GRANTED**, that the Commissioner's Motion for Remand, (R. 21), be **GRANTED**, and that this case be **REMANDED** under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,

1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  November 17, 2021                          S/ PATRICIA T. MORRIS
                                                  Patricia T. Morris
                                                  United States Magistrate Judge